U44603

| | |
|---|---|
| JOEL G. PORTER | CASE NO. ____ DIV. ____ |
| VS. | 19th JUDICIAL DISTRICT COURT |
| PEOPLE MAGAZINE<br>TIME, INC., TIME INC BOOKS<br>d/b/a PEOPLE MAGAZINE and<br>ANNE LANG and STEVE HELLING<br>(In their individual and official capacities<br>With People Magazine and Time Inc. Books<br>And Time, Inc.) | PARISH OF EAST BATON ROUGE<br>STATE OF LOUISIANA<br><br>COST OK $ 514.00<br>DEC 1 8 2015<br>C1 5639 n<br>DEPUTY CLERK OF COURT |

**D**

## ORIGINAL PETITION FOR DAMAGES

**NOW INTO COURT**, comes plaintiff, **JOEL G. PORTER**, a person of the full majority, who is domiciled in the Parish of East Baton Rouge who respectfully represents that:

1.

Made defendant:

**TIMES GROUP, TIME BOOKS d/b/a PEOPLE'S MAGAZINE** a foreign business corporation with a principal place of business located in the State of Delaware and doing business in the State of Louisiana, and within the jurisdiction of this Honorable Court.

**ANNE LANG**, Freelance Journalist and contract writer for People Magazine, a person of the full age of majority doing business and is domiciled in the State of Louisiana, and within the jurisdiction of this Honorable Court.

**STEVE HELLING**, Staff Writer, People Magazine, a person of the full age of majority, upon information and belief is domiciled in the State of Florida, and within the jurisdiction of this Honorable Court

2.

### NATURE OF THE ACTION

This defamation action arises out of the publication of a demonstratively false, malicious and outrageous publication of and Article in it's January 5, 2015 edition by **PEOPLE MAGAZINE** entitled *"WHO KILLED DENISE PORTER?"*, and subsequent Live Internet Broadcast feed entitled, *"Nearly 30 Years After Brutal Killing, Authorities Reopen Cold Case of Denise Porter"*, www.people.com/article/deniseporter-cold-case-reopened. People Magazine Contract Reporter, **Anne Lang**, freelance journalist, wrote the article, which appeared in the January 5, 2015 publication by People Magazine. People Magazine has a readership of 46.6 million readers. The live broadcast feed entitled, *"Nearly 30 Years After Brutal Killing, Authorities Reopen Cold Case of Denise Porter"*, www.people.com/article/deniseporter-cold-case-reopened first appeared

REC'D C.P.

DEC 1 8 2015

on line on December 22, 2014, and was hosted by **Steve Helling**, staff writer for People magazine.

3.

Defendants' purpose in publishing the January 5, 2015 article and the live broadcast feed was to weave a narrative that falsely and wrongfully depicted Joel Porter as the person who killed his wife Denise Porter some 30 years ago on March 14, 1985, and to recklessly sear the aforementioned depiction into the national public mind. Additionally, defendants' live broadcast feed invited running commentary -- profoundly defamatory and scandalous in its boundless and recklessly speculative nature, from its national listening/viewing public -- the defamatory substance and content of which defendants should be held liable, as defendants acts of incorporating such defamatory and scandalous commentary into its live blog without issuing specific disclaimers regarding the same, constitutes an act of defendants' active adoption, adaptation and ratification of the aforementioned defamatory scandalous content, contributed to defendants' live feed by its listening/viewing audience.

4.

The article leads with a very intriguing question, *"WHO KILLED DENISE PORTER?"* Then the narrative of the article begins to answer the question posed, by depicting Joel Porter as the person with a motive to kill his wife Denise Porter, thus damaging Joel Porter personal and professional reputations.

5.

The purpose of the live broadcast internet feed was to identify Joel as the person who killed his wife and, without one shred of credible evidence, create a national frenzy by stirring up a sense of outrage in the public against Joel Porter, thus promoting and increasing the sale of defendants' magazine. Steve Helling, host of the live broadcast feed, through his outright false and defamatory comments, created such an intensely distorted and degraded view of Joel Porter, that the personal and professional harm occasioned by said comments remains virtually irreparable. These defamatory and false publications/statements brought on a most sweeping devastation to Joel Porter's personal and professional reputation, and wreaked profound damage upon his overall psychological and emotional wellbeing.

2

6.

The purpose of both the written publication and the live broadcast feed was to elicit such a sense of outrage within the hearts and minds of the viewing and listening audiences as to create a virtual echo chamber through which members of said viewing/listening public was then invited, solicited and ratified by People Magazine to indiscriminately and recklessly contribute their own unfounded and wildly speculative slanderous, defamatory and malicious comments regarding the People Magazine depiction of Joel Porter which had been irrevocably seared into their minds.

7.

In the written January 5, 2015 publication entitled "*WHO KILLED DENISE PORTER?*", if the writer's true intent was to objectively explore the rhetorical question, of "who killed Denise Porter? Anne Lang and People Magazine certainly would have considered in the article the fact that Denise, at or near the time of her death, was intimately involved with several men and had been involved in multiple affairs during her marriage to her husband, Joel Porter. The article does not mention a single one of Denise Porter's paramours, nor does it make any reference as to her multiple extramarital affairs. Instead, without providing any context or qualification, the article trains its accusatory focus exclusively upon Joel Porter, by sheer virtue of his marriage to Denise Porter, as the only individual who could have possibly had a motive to kill his wife. Joel Porter, who at all times herein mentioned, was a faithful, hardworking, studious and loving husband, has never been discussed nor even alluded to in the aforementioned light. Defendants, People Magazine and Anne Lang, rather than objectively and honestly address the questions posed by the subject article -- through readily accessible factual information that existed within the public domain regarding the multiple affairs Denise Porter was conducting during the course of her marriage to Joel Porter -- chose instead to ignore the truth and proceed headlong with their ignominious and villainous depiction of Joel Porter as the murderer of his wife, Denise Porter.

## FACTUAL BACKGROUND

8.

On March 15, 1985, Joel Porter upon returning home from his over night shift at the U. S. Post Office, found his wife, Denise Porter [DENISE], had been brutally murdered inside of the apartment that they shared together.

9.

The Baton Rouge Police Department [BRPD] Homicide Division immediately launched an investigation and came to the Post Office to confirm that Joel was indeed working at the time of his wife's death and that he had in fact not left at anytime during his shift. Several months after the aforementioned crime the case grew cold and homicide investigator were unable to ascertain the individual(s) who perpetrated the heinous crime.

10.

In 2013 (almost 28 years following the death of DENISE) JOEL (now a very prominent Baton Rouge attorney), filed a very controversial lawsuit aimed act rectifying certain Voting Rights Act violations regarding the method of how Baton Rouge City Court Judges were elected.

11.

Only months after the above-referenced controversial lawsuit was filed, JOEL was contacted by a homicide detective with BRPD named, John Dauthier [DAUTHIER], who indicated that he was reopening the cold case of his (JOEL'S) wife DENISE'S 1985 murder.

12.

On March 7, 2013, cold case detective, John Dauthier without ever calling Joel to request that he voluntarily submit a sample of his DNA subsequently provided false and misleading information to a 19th Judicial District Judge in a sworn affidavit, in order to obtain a search and seizure warrant which he used to procure a DNA sample from JOEL on the side of the highway I-10.

13.

Approximately one month later, Dauthier, BRPD and the District Attorney's Office began receiving forensic results from the Louisiana Crime Lab tests of JOEL'S

4

DNA sample, compared against key evidence from the crime scene. This first set of results was received as early as April of 2013 (a month following DAUTHIER'S procurement of JOEL'S DNA). The forensic results clearly showed that JOEL was not implicated in his wife's murder.

14.

On May 2013, approximately two months later, Dauthier, BRPD and the District Attorney's Office received another set of forensic results from the Louisiana Crime Lab tests of procured JOEL'S DNA. Once again, these forensic results as well clearly showed that JOEL was not implicated in his wife's murder.

15.

On August 2013, some five months later, Dauthier, BRPD and the District Attorney's Office received yet another voluminous set of forensic results from the Louisiana Crime Lab tests of JOEL's DNA. These forensic results as well clearly showed that JOEL was not implicated in his wife's murder.

16.

Notwithstanding: (a) the exculpatory information/evidence contained in the original and supplemental investigative report from 1985; and (b) the **April, May and August, 2013 forensic results** from the Louisiana Crime Lab tests run on JOEL'S DNA, vis-à-vis key pieces of evidence from the crime scene, DAUTHIER, in concert with a local reporter and media outlet subsequently published an article on January 19, 2014, in which it quoted directly from a sworn statement in the March 7, 2013 search and seizure warrant application wherein the officer stated that "JOEL had always been a suspect in his (JOEL'S) wife's murder".

17.

By April of 2014, Dauthier, BRPD, the District Attorney's Office, and the State Attorney General's Office were in receipt of the fourth and final set of forensic results from the Louisiana Crime Lab's testing of JOEL'S DNA. Among the items against which JOEL'S DNA was compared to, was DNA left on the ankle area of DENISE presumably by her Killer. The cold case file revealed that Denise was dragged by her ankles as indicated by a bloody hand print left on her right ankle and by the fact of the bloody drag marks left on the carpet wherein Joel's wife, Denise Porter was obviously

5

dragged. The Louisiana Crime Lab determined that the DNA found on Denise was from an unidentified male presumably the Killer.

18.

In point of fact, Joel's DNA was not present on the any of the better than two-dozen items seized from the crime scene on March 15, 1985. Joel's DNA was not on the bloody rags taken from the kitchen which presumably the killer clean himself or the knife investigators seized from the crime scene. Joel's DNA was not on the bloody towel taken from the upstairs bathroom which presumably the Killer clean himself up with as well. Joel's DNA was not present on the Ivory Soap bottle taken from the kitchen sink. Joel's DNA was not present on other knives seized from the crime scene. Joel's DNA was not on the clothing taken from his wife's body.

19.

In addition, The Louisiana Crime Lab further determined that JOEL was definitively **excluded** as the contributor of the DNA found on the ankle area of his wife, thus the State Attorney General's Office released the aforementioned forensic and DNA testing reports.

20.

On January 17, 2014, as a result of the false and malicious statements made by Dauthier in the March 7, 2013 application for the search and seizure warrant and Dauthier's statement to the news media, PLAINTIFF, Joel Porter herein filed a federal lawsuit against JOHN DAUTHIER, for defamation and denigration of JOEL'S image in the community, despite the overwhelming amount of exculpatory evidence that he (Dauthier) was privy to and/or in possession of prior to using his influence to persuade the local media to write, publish and widely circulate the defamatory article.

21.

On July and August 2014, Dauthier and Chief of Police Carl Dabadie testified in federal depositions respectively that Joel was not a suspect.

22.

In spite of the aforementioned, On December 22, 2014, People Magazine (and two of its reporters, namely Anne Lang and Steve Helling) released a live broadcast internet feed **(PEOPLE.COM: NEARLY 30 Years After Brutal Killing, Authorties**

6

Reopen Cold Case of Denise Porter, http://www.people.com/article/denise-porter-cold-case-reopened), in conjunction with it's January 15, 2015 magazine edition release, wherein Steve Helling stated that *"Police interviewed Porter's husband, Joel Porter, but he seemingly had an ironclad alibi: he was working an overnight job, and no one saw him leave the premises."*

23.

The above-referenced statement by Steve Helling and People Magazine, i.e., that JOEL'S alibi was only *seemingly* ironclad because *no one saw him* (JOEL) leave the premises, is a clear stated and was intended to have its readership infer that JOEL, in fact, did manage to leave the premises without anyone observing him leave. Thus the conclusion that PEOPLE MAGAZINE strongly encourages the public and world at large to draw from the aforementioned statement is that JOEL'S alibi (that he was working an overnight job), was only a *seemingly* ironclad alibi, since he (JOEL) was stealthy and sophisticated enough to: (a) leave work; (b) drive to the apartment; (b) commit the murder of his wife; (c) clean himself up; (d) clean up the scene of the crime; (e) change clothes; (f) drive back to work without anyone ever noticing his departure or return; (g) without change of his disposition or change in his demeanor or attitude; (h) elude over a hundred employees including supervisors and postal inspectors; (i) and without leaving blood evidence in his vehicle, work site, or on himself;

24.

It is estimated that it would have taken anywhere between 2 to 2 and ½ hours for Joel to have accomplished all of the aforementioned acts, which would have been impossible given the critical and visible nature of Joel's position within the Post Office.

25.

Further down, in the same PEOPLE MAGAZINE article, the writer states that: "Denise Porter's family is *thrilled* with the renewed attention on the investigation" The writer then goes on to state that: *" . . . not everyone is happy with the latest developments. In a lawsuit filed by Joel Porter........ he claims that the lead detective, John C. Dauthier, violated his civil rights by pulling him over on the side of the highway to take a DNA swab."*

7

26.

People Magazine made a false statement and made a false publication by stating that *Joel Porter was not thrilled and was unhappy with the latest development*, i.e., the *re-opening of the Denise Porter cold case.* Steve Helling and People Magazine also defamed Joel Porter by implying and extrapolating the fact that Joel filed a federal lawsuit against Dauthier with *"not everyone is happy" with the latest developments"*, i.e. the reopening of the cold case file. However Joel's federal lawsuit against Dauthier had nothing at all to do with the *"latest developments"*, but was filed in response to Dauthier's calculated decision to defame Joel by publishing false and defamatory statements in his March 7, 2013 search and seizure warrant, i.e., "Joel has always been a suspect in the murder of his wife", and for violating Joel's civil and constitutional rights.

27.

In point of fact when Joel met with the State Attorney General's Office, the Assistant Attorney General assigned to the Denise Porter case offered to close the case. Joel forthwith and emphatically rejected the Attorney General's offer, making it abundantly clear that his desire was that the case remain open until the killer of his wife was brought to justice. Had PEOPLE MAGAZINE conducted a proper investigation and fact-check, it would have discovered that Joel was, in fact, "thrilled", and "happy with the latest development", i.e. the reopening of the cold case file.

28.

The clear intent of the above-quoted statements from the PEOPLE MAGAZINE article and live internet broadcast feed was to publicly state to the local, national and worldwide public readership/listenership that JOEL is the only family member that is not *"thrilled"* with the renewed attention to the investigation of DENISE'S murder, when, in fact, People Magazine never acquired nor took a statement from Joel to find out whether or not he was thrilled/happy with the renewed investigative attention or how he felt about the so called renewed investigative attention. People's Magazine never spoke to Joel or anyone connected to Joel to find out what or how he felt about the renewed investigative attention.

8

29.

Had People Magazine talked to Joel they would have found out that he too was also thrilled and happy with the renewed investigative attention, however he (Joel) was not thrilled John Dauthier and his handling of the investigation. Thus, the conclusion that PEOPLE MAGAZINE forcefully drives the public to draw from its defamatory publication is that the reason JOEL is not *thrilled* or happy (thus not considered as one of DENISE'S family members), with the renewed attention on the investigation is that he (JOEL) is guilty of murdering his wife. PEOPLE MAGAZINE, in fact, never knew what JOEL'S feelings were, because PEOPLE MAGAZINE, in fact, never spoke to Joel. People Magazine intentionally and reckless made a false and malicious statement, based upon the fact that Joel filed a federal lawsuit against the investigator for violating his civil and constitutional rights, that Joel was not thrilled nor happy with the reopening of the cold case of his wife's murder. Thus, People Magazine, proceeding from a false assumption, promulgated a profoundly defamatory publication based on that false, reckless and irresponsible assumption. Joel's lawsuit, in fact, had nothing at all to do with the fact of the renewed investigative attention of the reopening of the cold case regarding the death of his wife.

30.

In point of fact, even after Dauthier, BRDP and the Attorney General's Office received the forensic and DNA testing results (thus discovering that State Police Crime Lab found DNA from an *unknown male subject on Denise's body* -- presumably the DNA of the Killer), they (Dauthier, BRPD and the Attorney General's Office), sat complacently on the DNA testing results for two (2) years without ever seeking DNA samples from the other three or four men with whom Denise Porter was intimately involved during her marriage, until Joel Porter persisted in pressing them to at least take the DNA from one of the other paramours that Denise was having an extra martial affair with at or near the time of her death. It was Joel's relentless importunity that ultimately motivated the Attorney General's Office to seek a DNA sample from the former EBR Sheriff Deputy with whom Denise Porter was reported to have been involved with at or near the time of her death. Notwithstanding the foregoing, People Magazine falsely and

9

recklessly stated that Joel was not happy with the latest developments, i.e., Denise cold case being opened.

31.

A simple juxtaposition of the two above-referenced statements in paragraph 25 and 26, clearly reveal that the writers are discouraging the public from **properly** viewing JOEL as one of DENISE'S family members or as a victim of a horrible and unfortunate crime. Thus, the public is roundly discouraged from having any sympathy for JOEL as a family member/victim of this heinous crime. As such, PEOPLE MAGAZINE is liable for making and publishing defamatory statements about JOEL in its article. Said statements are defamatory.

32.

PEOPLE MAGAZINE'S reckless, outrageous, and irresponsible article and streaming broadcast created, generated and encouraged a feeding frenzy of reckless, outrageous, irresponsible, wildly speculative and unconscionable comments from all over the city, state and country about Joel which falsely and wrongfully suggested that Joel murdered his wife.

33.

PEOPLE MAGAZINE demonstrated a complete disregard for truth in proceeding with their December 22, 2014 defamatory article in conjunction with the live Internet fed, notwithstanding the fact that PEOPLE knew or should have known the following facts:

1) JOEL'S DNA had been taken on March 7, 2013;
2) That those Forensic results from JOEL'S DNA would be forthcoming shortly;
3) JOEL had filed a defamation action against DAUTHIER in January 17, 2014 because of DAUTHIER'S false and misleading statement declaring JOEL to be a suspect in his (JOEL'S) wife's murder;
4) Joel's defamation suit against Dauthier's also challenged the legitimacy and sufficiency of the search and seizure warrant itself;
5) JOEL'S defamation suit against DAUTHIER enumerated a prodigious list of exculpatory facts/evidence of which DAUTHIER stubbornly refused to acknowledge.

10

6) That on July 10, 2014, Dauthier testified in a federal deposition that Joel Porter has never been labeled a suspect.

7) That on August 6, 2014 Chief Carl Dabadie testified in a federal deposition that Joel Porter was not a suspect;

8) That Dauthier in pleading file in federal court said that Joel Porter was never officially a suspect;

9) That the local media printed an article wherein it was printed (quoting from the both federal depositions) in the public forum that Joel Porter was not a suspect by both Dauthier and Dabadie.

10) That one of Joel's supervisor who was on duty the night his wife was killed swore out in a sworn affidavit that Joel was at work on the night his wife was killed, that he interacted with Joel through out the night and because of the critical nature of his job it would have been impossible for him to have left work. He also stated that Joel's demeanor was the same and that he was being himself;

11) Joel's timecard revealed that he was at work and did not leave work;

12) Joel at all time cooperated with the investigation and with the investigators;

13) Joel voluntarily went down to the BRPD without the assistance of a lawyer provided a statement to police which was recorded;

14) Joel had inquired over the years into the reopening of the cold case file of his wife.

15) That Denise was involved in multiple affairs at or around the time of her death;

16) That Denise would frequently be out at other men's apartment all hours of the night and early morning hours;

34.

The reckless, irresponsible, outrageous and brazen conduct and outright *journalistic failure* of PEOPLE MAGAZINE is seen in the fact had PEOPLE MAGAZINE conducted itself as a reputable and legitimate news and media organization it would have **fact-checked**, and performed at the least the **minimal standard of journalistic research** and **independent investigation** into the facts and circumstances surrounding Denise's death. PEOPLE MAGAZINE story and Live Internet feed story **glossed over** circumstances and **suppressed** the objective fact of Joel's innocence. Had

11

PEOPLE MAGAZINE performed the minimal standard of investigation and not conducted itself in a **Tabloid** manner it would have found and discovered in the public arena the following exculpatory evidence all of which pointed away from Joel:

1. They would have discovered in the public forum a Federal Complaint filed by Joel on January 17, 2014 a listed of exculpatory evidence including but not limited to
    a) No DNA evidence;
    b) No Forensic evidence;
    c) No Eyewitness evidence;
    d) No Direct evidence;
    e) No Physical evidence;
    f) No Blood evidence;
    g) None of Joel's Tissue or Skin under Denise's finger nail;
    h) No Testimonial evidence;
    i) No Direct evidence;
    j) No Blood in Joel's Car;
    k) No Blood at Joel's work station;
    l) No Blood on Joel's clothing;
    m) No Confession;
    n) No Murder weapon connected to Joel in anyway;
    o) No change of clothing;
    p) No change in behavior;
    q) No motive;
    r) No opportunity;
    s) No cuts, lacerations, scratches, no burses or signs that Joel had been in a struggle.
2. The sworn affidavit by one of Joel's Supervisors who was on duty the night Joel's wife was killed.
3. The sworn affidavit by one a postal employee who was on duty the night Joel's wife was killed.
4. The DNA and forensic testing result of April 2013;

5. The DNA and forensic testing result of May 2013;

6. The DNA and forensic testing result of August 2013;

7. The DNA and forensic testing results of April 2014 which excluded Joel Porter and the contributor of the DNA found on Denise presumably left their by the killer

8. The DNA results of April 2014, which identified the DNA profile of an unknown male subject, presumably the killer.

9. That Joel fully cooperated with law enforcement authorities voluntarily gave a recorded statement, finger prints, and hand print;

10. That Joel over the year inquired of a local BRPD homicide investigator regarding the reopening of the Denise Porter cold case.

11. Joel's time card evidencing the time sheet evidencing he clocked on at 23:65 and ended his tour at 0816;

12. The fact that Denise was involved in multiple affairs;

13. The fact that there was a number of other individuals who could have been responsible for Denise's murder;

14. The fact that two (2) of the guys that Denise was involved with lived at the same apartment complex where Denise and Joel resided;

15. The fact that one of these guys was a EBRP Sheriff's Deputy;

16. That this Sheriff Deputy lied when questioned by homicide investigator about his involvement with Denise and the fact of him going to Joel's apartment when he would leave for work;

17. The fact that this Sheriff Deputy was also the security guard for the apartment complex where Joel and Denise resided;

18. The fact that this Sheriff Deputy had a master key to Joel's and Denise's apartment;

19. The fact that homicide investigators never confirmed this Sheriff Deputy's alibi;

20. That this Sheriff Deputy was at the complex on the night that Denise was killed and was present on the morning when Joel found her.

21. That Denise would often leave the apartment when Joel was at work and go to other guys apartment and stay to at least 3:00 a.m.;

22. The fact that there were seven (7) or (8) unidentified fingers prints found at the crime scene;

23. The fact that the killer left a bloody hand print on Denise's right ankle that did not belong to Joel;

24. The fact that Joel's DNA was not on the bloody rages presumably the killer cleaned up with;

25. The fact that Joel's DNA was not on the bloody towels that the Killer presumably cleaned up with.

26. The fact that when Joel left his apartment for work Denise was alive;

27. Denise was on the phone with one of her boyfriends from 12:00a.m to 1:00 a.m., when Joel was at work.

28. The fact that another man, namely RC was intimately involved with Denise at the time of her death, when questioned and or interviewed in April of 2013 dramatically changed his previous statement which was given in 1985.

29. The Fact that RC's alibi was and had never been verified or confirmed.

30. The fact that another man Denise was intimately involved with at or near the time of her death, namely GS alibi was never verified or confirmed.

35.

**Defamation Per Se**

As a result of the false, malicious, and defamatory statements contained in the December 22, 2014 article by PEOPLE MAGAZINE, wherein it was stated that ***no one saw JOEL leave the premises where he worked***, defendant PEOPLE is liable to Plaintiff, Joel Porter, both personally and professionally, for making such a recklessly false, malicious, irresponsible and defamatory and irreparably injurious statement to the general public for the sole and express purpose of characterizing JOEL as a suspect in his wife's murder. In fact and in truth, JOEL reported to his job at the U.S. Post Office at 23:65 and did not leave work until sometime after 0816 a.m. at the end of his shift the following morning.

36.

### Defamation By Innuendo

PEOPLE MAGAZINE is also liable to JOEL for making certain false allegations and accusations against JOEL with the purpose of fostering false, defamatory and irreparably injurious innuendo having a devastating and deleterious impact on his (JOEL'S) personal and professional reputation. PEOPLE'S suggestions that: (a) JOEL (as DENISE'S husband), is not one of DENISE'S family members; and (b) JOEL is not thrilled with the renewed attention to the investigation of DENISE'S murder (as all of DENISE'S other family members are), plants poisonous seeds of suspicion deep within the public mind. Thus PEOPLE has used its influence to suggest through innuendo that JOEL is a suspect to his wife's murder.

a

Steve Helling, reporter for PEOPLE MAGAZINE, defames JOEL by innuendo in his statements in the Live Internet feed regarding the killers *"unforced entry"* into the Porters' apartment. Mr. Helling *intentionally never discloses*, nor intimates to the public, the fact that DENISE was involved in a number of extra-marital affairs with several other men before and around the time of her death. Mr. Helling *purposefully and intentionally omitted and suppresses* the facts regarding DENISE'S extramarital affairs in order to keep the public's attention trained and focused on JOEL as the only individual who could have possibly gained entry into his apartment without force.

b

Mr. Helling's discussion of *"unforced entry,"* while intentionally suppressing all facts regarding DENISE'S multiple extra-marital affairs, was clearly designed to engrave an impression into the public mind that: no one other than JOEL could have possibly gained entry into his apartment without force. This is a **demonstrably false assertion** that Mr. Helling makes to the public with *full knowledge of its falsity*, as Mr. Helling was aware, from the cold-case supplemental investigative report, that two of the male individuals that DENISE was intimately involved with, actually lived in the same apartment complex as the Porters.

15

c.

A roommate of one of these two individuals [hereinafter RH], who lived at the same apartment complex as the Porters, told investigators that the other male individual, an East Baton Rouge Sheriff's Deputy - who was also employed as a security guard at the apartment complex - [hereinafter AJ], was having an affair with DENISE and would go to DENISE'S apartment after JOEL would leave for work. RH further stated that DENISE would also visit AJ at his apartment during the course of their affair.

d.

RH went on to tell investigators that his other friend/roommate [hereinafter GS] became intimate with DENISE after AJ'S affair with DENISE had ended. According to RH, DENISE would come over to the apartment that he shared with GS after JOEL would leave for work and would sometimes stay until 3 o'clock in the morning.

e.

Mr. Helling and PEOPLE MAGAZINE were also aware, from the cold-case supplemental investigative report, that detectives had interviewed another male individual [hereinafter RC] who was a student attending Louisiana State University [LSU] with DENISE. RC told detectives that he had fallen in love with DENISE in early February of 1984 (almost one year before DENISE'S death). RC also told investigators that he talked on the telephone with DENISE until almost 1:00 a.m. on March 14, 1985 (the date of the murder).

f.

Mr. Helling's assertion that there was *"unforced entry"* into DENISE'S apartment, while **intentionally omitting facts** regarding the three (3) above-referenced extra-marital relationships that DENISE had been involved in, rendered it substantially certain to Mr. Helling that JOEL PORTER'S name would become engulfed in clouds of public suspicion by virtue of the false statement/false impression that he (Helling) made to the public through innuendo regarding JOEL being the only individual who could have possibly gained entry into his (JOEL'S) apartment without force.

g.

Clearly, had Steve Helling, and PEOPLE MAGAZINE provided their reading public with an objective and detailed factual account of the intimate extra-marital

16

relationships that DENISE carried throughout her marriage with JOEL, the then 46.6 million readership would have been in the informed position to have reasonably considered the possibility that were several other individuals, besides JOEL, that could have very likely gained "unforced entry" into the apartment. In point of fact, during his interview with detectives, JOEL clearly indicated that upon arriving at his apartment on March 15, 1985: *"he stuck his key in the lock but noticed the door was unlocked."* This failure to provide their readership with all the facts was pure and simple a *journalistic malpractice of monumental proportion.*

h.

In Mr. Helling's and PEOPLE MAGAZINE'S internet article, after making reference to the fact that *"there were no signs of forced entry into the Porters' apartment"* and further pointing out that *"the killer had apparently showered in an upstairs bathroom after the slaying,"* he raised the *"question of motive,"* by asking: *"Who would want to kill the pleasant young woman who had recently been studying to become a nurse?"* Immediately following the aforementioned question, Mr. Helling and People Magazine point out that: *"Police interviewed Porter's husband, Joel Porter, but he seemingly had an ironclad alibi: he was working an overnight job, and no one saw he leave the premises."* Thus in effect inferring to its readership that Joel Porter had a motive to kill his wife.

i.

Steve Helling, reporter for People Magazine in his live broadcast internet feed raised the *"question of motive,"* by asking: *"Who would want to kill the pleasant young woman who had recently been studying to become a nurse?"*

What is particularly interesting about the PEOPLE MAGAZINE article is that Denise was portrayed as a pleasant young woman and nursing student, while on the other hand Joel was falsely portrayed as the person who had a *motive* to killer his wife. PEOPLE MAGAZINE didn't portray Joel as a loving husband. People Magazine didn't portray Joel as being a faithful husband. People Magazine didn't portray Joel as being a hardworking husband who was working all night long to take care of his wife.

People Magazine didn't portray Joel as a studious husband who was in addition to working all night, was going to school fulltime doing the day to make things better for his

17

wife for the future. Joel was not out running the streets. Joel was not out at night running women. Joel wasn't selling dope or doing drugs. Joel was trying to make a viable way of life for his wife and family. Thus in effect, People Magazine clearly suggested that Joel, at all times and altogether, lacked a basic interest in the fundamental wellbeing of his wife and family, by intentionally excluding from its article and discussions facts regarding the tremendous efforts that Joel had always exerted towards providing a viable life and future for his wife, Denise.

j.

After making the aforementioned statement, Mr. Helling then comments that: "Nearly 30 years after the killing, police have reopened the case. *"Police recently took a DNA swab from Joel Porter and began questioning possible witnesses."* Again, at no point during the aforementioned commentary, does Mr. Helling ever make reference to any of Denise's paramours that she was intimately involved in connection with his *"question of motive."* The cold case file mentioned at least three other men that Denise was intimately involved with at or around the time of her death. Similarly, Mr. Helling intentionally fails to indicate whether police interviewed AJ, GS or RC and whether they had alibis and/or witnesses to corroborate or refute their alibis. Finally, Mr. Helling never commented on whether or not police had taken DNA swabs from AJ, GS or RC. In addition, Mr. Helling does not provide his readership with the results of the forensic and DNA testing results provided by Louisiana State Police Crime Lab, which **excluded Joel Porter as the contributor of the DNA found on Denise body** and other evidence seized from the crime scene.

k.

In light of the above-delineated account of DENISE'S extra-marital relationships with AJ, GS and RC, Mr. Helling's exclusive focus upon JOEL in connection with the question that he posed regarding motive, constitutes a demonstrably *false journalistic* assertion that he (Helling) makes by way of innuendo to PEOPLE MAGAZINE'S readership.

l.

Clearly, had PEOPLE MAGAZINE provided their reading public with an objective and detailed factual account of the intimate extra-marital relationships that

18

DENISE carried throughout her marriage with JOEL, the readership would have been in the informed position to have reasonably considered the possibility that there were several other individuals that could have very likely had a *"motive"* to kill DENISE.

m.

Moreover, had Mr. Helling provided the PEOPLE MAGAZINE readership with the facts regarding DENISE'S extra-marital relationships and further pointed out that none of the men with whom she conducted these extra-marital relationships had been swabbed for their DNA at that point in time of the People Magazine Article, the PEOPLE MAGAZINE readership would have been in the informed position to have reasonably considered the possibility that there were several other individuals (namely: AJ, GS and RC), whose DNA the police should be seeking to obtain. Once again, PEOPLE MAGAZINE defamed Joel by innuendo by providing it readership with a very skewed factual account designed to frame Joel as the murderer of his wife. While providing the very skewed, warped account, the Live Internet feed would continue to show the wedding pictures of Denise and Joel. This insidious journalistic ploy and play between what was being said and shown as the visual backdrop to the commentary were shrewdly designed to strongly suggest and imply that Joel murdered his wife.

37.

**Intentional Infliction of Emotional Distress**

PEOPLE MAGAZINE'S extreme, reckless and outrageous conduct goes beyond the bounds of human decency and should not be tolerated in a legal and civil society. Plaintiff, JOEL PORTER has suffered and continues to suffer severe emotional distress as a result of said extreme, reckless and outrageous conduct. PEOPLE MAGAZINE clearly desired to inflict severe and debilitating emotional distress or knew to a substantial certainty that severe emotional distress would be certain or substantially certain to result from its (PEOPLE'S) conduct and that PEOPLE MAGAZINE'S malicious and outrageous conduct in publishing a demonstratively false and defamatory article on December 22, 2014 and its subsequent Live internet broadcast feed would substantially result in severe professional and personal damage to plaintiff, Joel Porter.

19

WHEREFORE, Plaintiff prays that after due proceedings are had, there be a judgment herein in favor of plaintiff and against defendants for such damages as are reasonable under the premises as follows:

I. In favor of plaintiff, **JOEL G. PORTER**, and against defendants, **PEOPLE MAGAZINE;**, TIMES GROUP, TIME BOOKS **ANNE LANG**, and **STEVE HELLING**, individually, jointly, and in sildo

II. Granting PLAINTIFF herein, legal interest on all sums awarded from their respective due dates, or alternatively, from date of judicial demand, until paid, and casting DEFENDANT, PEOPLE MAGAZINE, TIMES INC, TIME BOOKS **ANNE LANG**, and **STEVE HELLING, individually, jointly, and in sildo** for all costs of these proceedings; and

III. PLAINTIFF further prays for all general and equitable relief, including attorney's fees.

RESPECTFULLY SUBMITTED:

Joel G. Porter
Bar Roll No. 21825
Attorney at Law
1208 Julia Street
Baton Rouge, Louisiana 70802
Tel (225) 978-1955
Fax (225) 456-2886
Email: Joelg9962@gmail.com
*Attorney for Plaintiff*

ELTON HERON #28077
Attorney at Law
37218 Audubon Park Ave
Geismar, La 70732
(504) 723-8782
(225) 673-4095 Fax
heron.elton@gmail.com

Please Serve:

PEOPLE MAGAZINE
TIME, INC., TIME INC BOOKS
d/b/a PEOPLE MAGAZINE
Time & Life Building
1271 Avenue of the Americas
New York, NY 10020

CIVIL

- ☒ 01-DAMAGES
- ☐ 02-CONTRACT
- ☐ 03-PRISONER SUIT
- ☐ 04-EXECU...
- ☐ 05-SUIT
- ☐ 06-EVIC...
- ☐ 07-WORKMENS COMPENSATION
- ☐ 08-JUDICIAL REVIEW
- ☐ 09-PROPERTY RIGHTS
- ☐ 10-INJUNCTION MANDAMUS
- ☐ 11-COMM. PROP. PARTITIONS
- ☐ 12-PUBLIC SERV. COMM.
- ☐ 13-OTHER PARTITIONS
- ☐ 14-OTHER
- ☐ 15-...
- ☐ 16-...
- ☐ 17-
- ☐ 18-
- ☐ 19-
- ☐ 20-

20